**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1814**

---

DAVINA RICKETTS,

Plaintiff - Appellant,

v.

WAKE COUNTY PUBLIC SCHOOL SYSTEM, WCPSS; WAKE COUNTY BOARD OF EDUCATION; KEITH SUTTON, current Board Member; CHRISTINE KUSHNER, current Board Member; JAMES MARTIN, current Board Member; ROXIE CASH, current Board Member; MONIKA JOHNSON-HOSTLER, current Board Member; LINDSAY MAHAFFEY, current Board Member; TOM BENTON, former Board Member, in his individual capacity; BILL FLETCHER, former Board Member, in his individual capacity; SUSAN EVANS, former Board Member, in her individual capacity; KEVIN HILL, former Board Member, in his individual capacity; JAMES MERRILL, former Superintendent, in his individual capacity; CATHY MOORE, former Deputy Superintendent for School Performance and current Superintendent, in her individual capacity; MARVIN CONNELLY, former Chief of Staff, in his individual capacity; DANNY BARNES, former Area Superintendent, in his individual capacity; RODNEY TRICE, Assistant Superintendent for Equity Affairs, in his individual capacity; SCOTT LYONS, former Principal of Enloe and current Principal of Heritage High School, in his individual capacity; MONICA SAWYER, Asst. Principal of Enloe High School, in her individual capacity; GEORGE BARILICH, 2016 Student Council Election Advisor and current Enloe teacher, in his individual capacity; TRUDY PRICE-ONEIL, Editor of Enloe newspaper, in her individual capacity,

Defendants - Appellees.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:21-cv-00049-FL)

---

---

Argued:  September 25, 2024                              Decided:  January 7, 2025

---

Before GREGORY and HARRIS, Circuit Judges, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Harris and Judge Gibney joined.

---

**ARGUED:**  Alexander George Siemers, LATHAM & WATKINS, LLP, Washington, D.C., for Appellant.  Stephen Grayson Rawson, THARRINGTON SMITH L.L.P., Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  Neal A. Ramee, Joshua E. Renz, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellees.

---

GREGORY, Circuit Judge:

Davina Ricketts, then a sophomore at a high school in North Carolina, decided to run for student council in hopes of remedying its lack of diversity. Instead, Ricketts' decision to run for student council was met with racial harassment and cyberbullying from her peers, while the school district allegedly failed to sufficiently intervene.

Ricketts brought this action below, contending, amongst other things, the school district was deliberately indifferent to her harassment. The district court dismissed Ricketts' complaint and then denied her motion for leave to amend on futility grounds, reasoning that her proposed amended complaint likewise failed to state a claim.

On appeal, Ricketts challenges the district court's denial of her motion for leave to amend. Considering the facts as pled in the proposed amended complaint, Ricketts has sufficiently alleged deliberate indifference, retaliation, and equal protection claims at this stage. Accordingly, we reverse the judgment below, direct the district court to allow Ricketts to amend her complaint, and remand for further proceedings.

I.

The following facts were alleged in Ricketts' proposed Second Amended Complaint.[1] In February 2016, Davina Ricketts was a sophomore at William G. Enloe High School ("Enloe"), a Raleigh, North Carolina high school part of the Wake County Public School System, which is governed by the Wake County Board of Education (the

---

[1] In light of the fact Ricketts is challenging the district court's denial of her motion for leave to amend, the facts here are drawn from Ricketts' proposed Second Amended Complaint, J.A. 103–58, and the accompanying exhibits, J.A. 160–224.

"Board"). J.A. 104–05. Student council elections were approaching at Enloe and were scheduled to be held on March 4, 2016. J.A. 114. Scott Lyons, Enloe's school principal, appointed George Barilich, an English teacher, to oversee the election. J.A. 106, 114. Monica Sawyer, Enloe's assistant principal, was tasked with assisting Barilich with the elections. J.A. 105; 114. Barilich delegated some of his election oversight responsibilities to student council members, including the receipt of candidacy applications and input of candidate names on the ballots online. J.A. 114–15.

All students interested in a student council position were directed to submit a candidacy application to a student council member. J.A. 115. Ricketts submitted a timely application declaring her candidacy for junior class vice president. J.A. 115. Over a hundred students declared their candidacy to become a student council member as well, including three Black sophomore students. J.A. 114–15.

On February 29, 2016, the student council vice president emailed over 100 potential candidates, including Ricketts, to confirm the students' names and the offices for which they were running, and included a request for any corrections that were necessary. J.A. 115. The next day, Ricketts, upon realizing she had accidentally applied to run in the sophomore class election, instead of the junior class election, immediately emailed the student council vice president to correct her candidacy application. *Id.* In an email to Lyons, Barilich stated the student council vice president had made the correction to Ricketts' candidacy application. J.A. 118.

4

A.

The campaign period ran from March 1 to March 3, 2016. J.A. 115. During this time, multiple social media accounts were created on Twitter, now known as X, by student council members purporting to be representing Enloe. J.A. 115. The Twitter accounts posted polls, which prompted Twitter viewers to indicate which candidate they intended to vote for, as well as posts promoting student council candidates. J.A. 115. Ricketts and the three other Black sophomore students were excluded from all the polls and posts. *Id.* After Ricketts and the three other Black sophomore students "spoke out" about the Twitter posts, the accounts were ultimately taken down. J.A. 116. Additionally, Ricketts described the exclusion to the student council vice president, who apologized on behalf of the entire student council but nonetheless denied that members of the student council were involved in the Twitter account polls and posts. J.A. 117.

Additionally, and simultaneously, campaign materials including posters and promotional bookbag-tags that belonged to Ricketts and the three other Black sophomore students were defaced, ripped, and thrown throughout the Enloe building. J.A. 115–16. No white students had any of their campaign materials defaced, ripped, or thrown throughout the Enloe building. *Id.* The "huge amounts of trash produced by the shredding of [Ricketts'] promotional materials" and the materials of the three other Black sophomore students could not be "missed by anyone" and were in "shared areas that administrators walked by every day." J.A. 137; *see also* J.A. 116. Lyons, Sawyer, and Barilich were aware of these discriminatory acts, but did nothing to address the situation. *Id.*

5

B.

On March 4, 2016, six hours after the student council election voting was supposed to take place, the student council vice president emailed all candidates and reported technical difficulties with the voting website. J.A. 116. Hours later, Barilich provided a different interpretation for the delay, and stated it was due to Enloe's failure to make a payment to the website used for hosting the election. *Id.* Barilich subsequently purchased a new website to be used for hosting the election. *Id.* Accordingly, the student council elections were postponed from March 4 to March 7, 2016. *Id.* A student council member was tasked with creating the new candidate list and ballot. J.A. 117.

On March 7, 2016, the new date of the student council elections, Ricketts saw that her name, as well as the names of the other three Black sophomore students, did not appear on the junior class election ballot. J.A. 117–18. Ricketts reported this exclusion to Sawyer and Barilich, stating the exclusion "look[ed] like discrimination." J.A. 118. Sawyer and Barilich "did not comment" on Ricketts' statement and refused to talk to the other Black candidates who were excluded. *Id.* Sawyer did, however, communicate to Ricketts that her name appeared on the sophomore ballot. *Id.* Ricketts explained that while she originally applied for candidacy in the sophomore class election by mistake, she corrected her mistake via email, and in an email to Lyons, Barilich stated that the student council vice president had made the correction. *Id.* Soon after, Barilich informed the student election candidates that some candidates had been excluded from the ballot due to "miscommunication between [the] two websites" and that the original website was "malfunctioning." *Id.* A source from the original website reported they had not been

6

contacted by Enloe regarding any malfunctioning issues, and Enloe had not created any ballots on the website in 2016. J.A. 116, 118, 172. This "false" statement by Barilich "marked the start of the consequential racial harassment against" Ricketts. J.A. 118.

That same day, Ricketts' parent called Lyons, but neither he nor Sawyer returned the call. J.A. 118. Additionally, Ricketts' parent, along with others, contacted the District Superintendent James Merrill's office to request a meeting and to report "the discriminatory act," but Merrill refused to meet. J.A. 105; 118. Ricketts' parent also emailed Lyons, asking for a meeting. J.A. 118–19. Lyons responded that nine students had been left off the ballot or put on the wrong ballot, but otherwise refused to meet. *Id.* Instead, Lyons summoned Ricketts and the eight other students to his office and informed them they were left off the ballot "due to something wrong with the website plus 'some oversight'" issues. J.A. 119.

Later that same day, Lyons, with the support of Danny Barnes, the District's Central Area Superintendent, announced that a new election would take place on March 24, 2016, seventeen days later. J.A. 105; 119. All candidates were directed to repeat the entire qualifying and three-day campaign process, and Barilich and student council members would remain in charge of the second election. J.A. 119, 128. Ricketts was the only Black student out of the four Black students who were excluded from the ballot to re-declare her candidacy for the March 24, 2016 election. J.A. 119.

## C.

Starting over the election process angered many students. J.A. 119. On March 8, 2016—the day after the election was postponed—a student who was frustrated by the

7

reelection requirement made a bomb threat at Enloe. J.A. 122, 134. Lyons dismissed the bomb threat as a "prank." J.A. 122, 134.

Additionally, during this time, many disgruntled students, along with some of their parents, "immediately" started cyberbullying Ricketts by labeling her as one of the "angry Black girls" and blaming Ricketts for "wrongly overreacting to a 'technical glitch' and calling it discrimination." J.A. 119. Enloe students would whisper about Ricketts and the three other Black sophomores in class, and others posted hostilities to their personal Twitter accounts. J.A. 119–20. Allegations were also spread that Black students could not run for student council because their GPAs were too low. J.A. 120–21. As Ricketts started campaigning for reelection, her promotional materials were again destroyed, while the promotional materials of white candidates remained intact. J.A. 122. This, paired with the recent bomb threat, made Ricketts fearful to attend school. *Id.*

The school district "had control over the student harassers" and could have pursued disciplinary action, as the school district pursued such action in 2017 when three students were "suspended . . . for sharing a private video with other students in which the three made 'derogatory statements against different ethnic and racial groups.'" J.A. 138–39.

On March 8, 2016, Ricketts' mother also emailed Marvin Connelly, Chief of Staff for the Wake County Public School System, and copied Merrill, Barnes, and Lyons, stating Black students were "currently being blamed for the restart of the entire process" and were being "targeted for anger over something they did not cause[.]" J.A. 125, 179. That same day, Ricketts' mother emailed Lyons and copied Barnes, Connelly, and Merrill expressing

8

similar frustrations with Black students being harassed at Enloe and the desire for Enloe to "address expectations of equality." J.A. 180–81.

On March 9, 2016, the local news outlet ran a story regarding the Enloe student council election, in which Ricketts' mother, and the mother of another excluded Black student, were interviewed. J.A. 121, 173. Ricketts' mother and the other mother stated, amongst other things, "they believe the color of their children's skin" led to the ballot exclusion, despite the school district's claim that "it was human error." J.A. 173. The mothers showed the news outlet "an email exchange with Enloe principal Scott Lyons" regarding the ballot exclusion, "where [Lyons] wrote this was 'obviously a mistake.'" *Id.* On the local news outlet's website, dozens of anonymous online commenters disparaged the students and their parents and wrote race-based, derogatory remarks; for example, that Black kids' dads were not in the picture, the administration covers for mistakes of Black kids; and Black people were "better off" during segregation. J.A. 121, 174–77.

In a letter from Lyons dated March 1, 2016, but postmarked with a March 11, 2016, date, Ricketts' parents were informed Ricketts had accrued 15 days of absences, and therefore, did not qualify to participate in certain extra-curricular activities, including the student council election. J.A. 151, 190. Ricketts' parents had to explain these were excused absences that were documented with medical notes to reclaim Ricketts' right to participate in the election. *Id.* This treatment varied from that of a white student at Enloe, who was allowed to remain on student council despite being suspended in 2016 and was permitted to run for reelection in the same election as Ricketts without issue. J.A. 147.

9

On March 11, 2016, Ricketts' mother emailed Lyons, Barnes, Connelly, and Merrill, expressing frustration that she had not received a response regarding ballot exclusion, and stating Ricketts "and others involved [were] being harassed" and "You have a racial divide on your hands[.]" J.A. 181–82.

On March 14, 2016, a civil-rights advocate and a local NAACP leader contacted Enloe administrators and urged them to conduct a thorough investigation on the ballot exclusion incident, but such requests were ignored. J.A. 126.

On March 15, 2016, Lyons responded to the March 11, 2016 email sent by Ricketts' mother. J.A. 186. Specifically, Lyons stated that nine students had been left off the ballot, not just the four Black students. J.A. 119, 186. Lyons also explained that he met with Ricketts and the eight other students to say the same and apologize for the ballot errors. J.A. 119, 187. Finally, Lyons wrote, "In one of your emails you stated that your daughter and others are being harassed. I have not received any reports of harassment – please ask [Ricketts] and the others to come see me or another administrator to discuss this so that we can follow up." J.A. 186–87.

On March 17, 2016, Enloe faced a second bomb threat by another student. J.A. 122. As with the first instance, Lyons dismissed the bomb threat as a "prank." J.A. 122, 134.

On March 18, 2016, Ricketts' mother responded to Lyons' March 15, 2016 email. *See* J.A. 188. Specifically, Ricketts' mother expressed frustration regarding, among other things, the fact Lyons "[failed] to inquire and address the racial tension, comments, and harassment," and that he would "expect any student to confront [him] instead of vice versa." J.A. 189. Lyons "deliberately ignored and continued to ignore the repeated racial

10

harassment against [Ricketts] online and on campus and the multiple complaints from [Ricketts'] parent and failed to intervene." J.A. 147.

Additionally, during the reelection period[2], Ricketts, an "A" student, sought "letters of academic reference" from two teachers for a summer abroad medical program application. J.A. 152. Both teachers refused. *Id.* One teacher stated that she "didn't feel like" writing a letter of academic reference, despite doing so for a white peer. J.A. 182. Another teacher stated Ricketts should have asked for a letter of academic reference in-person, instead of submitting a written request. *Id.* One of these teachers ignored Ricketts when Ricketts greeted her in the hallway after Ricketts became known "to the school body and staff" as the "angry Black girl" who "made a big deal out of nothing." J.A. 152.

Moreover, during the election period, the April edition of the Enloe school newspaper was published, and was riddled with racial stereotypes and derogatory remarks toward minority students. J.A. 113, 161–170. The paper was overseen by its editor, Trudy Price-O'Neil, an Enloe teacher, who "condoned" the "mostly" white students' articles and "labeled the contents as just jokes." J.A. 113; *see also* J.A. 145. More than one article parodied the events of the student council election—in one, a cockroach named Dee D. Roach from Southeast Raleigh, a predominately Black neighborhood, "tells all," and said their kind were "drastically underrepresented in student government," announced their campaign for student council, and said they must get to work making their promotional bookbag tags. J.A. 168. Another article concerned "the recent uproar and confusion surrounding the alleged lack of

---

[2] While the proposed Second Amended Complaint states this occurred during the "March 2017 election period[,]" J.A. 152, this appears to be a typographical error.

representation at the Oscars." J.A. 163. The article went on to say the Black Entertainment Television awards were "the real culprits of exclusion" and the "sanity and sobriety" of those making discrimination claims should be questioned. *Id.* Elsewhere, the paper advertised "White History Month," the student council president expressing their need to "build a wall," and Lyons "participat[ing]" in an interview for a profile piece and describing how he "coped" as a White man in Southeast Raleigh, and how he "raps" about all the ill treatment experienced as such a minority. J.A. 113–14, 161–170.

### D.

The election occurred on March 24, 2016, and Ricketts was unsuccessful in winning a seat on the student council. *See* J.A. 128. Despite the fact student council elections were over, Ricketts continued to experience racial harassment at Enloe and was "called and regarded as the 'angry Black girl' who irrationally made a big deal out [of] a simple 'error' and caused 100 candidates hardship[.]" J.A. 133–135, 157. Such racial harassment also impacted Ricketts' physical health and mental well-being. J.A. 157. Ricketts had multiple "incidents of fainting[,]" one of which caused a concussion and subsequent "difficulties to engage in schoolwork and properly learn in class." J.A. 157–58. Ricketts also suffered from "anxiety, . . . emotional distress[,]" suicidal thoughts, and a "sudden and drastic drop[] in grades in some classes." J.A. 153, 157–58.

Following the student council election, Ricketts was not reselected for the varsity cheerleading team. J.A. 153. Though she had been on the team for two years, the coach selected a junior varsity student in her place. *Id.* In addition, Ricketts anticipated an International Baccalaureate diploma upon graduation in 2018, but was "informed about

12

ineligibility after submitting an essay previously reviewed, edited, and approved by [Ricketts'] IB teachers/advisors prior to submission." J.A. 152. Ricketts was "informed the essay was one point short of receiving her IB Diploma" despite receiving passing grades in weighted courses. *Id.* Additionally, Ricketts was "pinned in an honorary ceremony, but never given such a diploma." *Id.* Ricketts' parents "reached out to the International IB Ombudsman, who initially reported they would investigate the matter, but ended up ceasing all communication and referred [Ricketts] to contact Enloe." *Id.* Other than summarily stating Ricketts' essay was scored by an "unknown individual living in another country[,]" Enloe never provided any further reason for the outcome. *Id.* Ricketts continued to experience a hostile environment at Enloe until 2018, her graduation date. J.A. 133.

In May 2016, Lyons, Connelly, and Barnes "appointed" Assistant Superintendent for Equity Affairs Rodney Trice to conduct an "internal investigation" into the March 2016 election errors. J.A. 105; 127, 144. During his investigation, Trice took statements from at least three students who described the racial name-calling, destruction of campaign materials, and harmful rumors about Black students. J.A. 120–21. Ricketts "did not participate" in the investigation and Trice "did not interview" the parents of the impacted students. J.A. 120, 127–29. In a "previous phone call with [Ricketts' mother], Trice said that he sympathized with her frustration with Enloe administration's indifference to discrimination" but nonetheless stated "he wore 'two hats.'" J.A. 145. After that call, Trice "stopped responding to her inquiries." *Id.* The outcome of the internal investigation is unclear, as no investigative report was ever provided. *See* J.A. 127–28.

13

The Board of Education (the "Board") had a policy of "disregard[ing] discrimination" and "dismiss[ing] discrimination complaints" for "many years[,]" J.A. 110, 139, and, as a result of such discrimination, Legal Aid of North Carolina filed "[n]umerous discrimination complaints" with the Department of Justice and the Office of Civil Rights, J.A. 140. In addition, there has been "[p]ublic outcry" due to "discrimination against African American students[.]" J.A. 140. For example, at a June 2016 Board meeting, Shirley Tang, a civil rights advocate for students, informed the Board of the cyberbullying against Ricketts and the other three Black sophomore students, the "hardship" posed by repeating the campaign process, and how previous complaints about discrimination had been ignored. J.A. 126. No one responded at the time. *Id.* Later, when "discussing the issue of indifference to discrimination and the ineffectiveness of resolution that [Ricketts] and other minority students faced[,]" some Board members stated "[t]hat's just the culture." J.A. 140.

## II.

On February 2, 2021, Ricketts filed a pro se action in the Eastern District of North Carolina against the Wake County Board of Education and various individuals. J.A. 1–4. On February 24, 2021, Ricketts filed an amended complaint against Wake County Public School System, Wake County Board of Education, and various individuals asserting claims under Title VI of the Civil Rights Act. J.A. 11–59.

Defendants filed a motion to dismiss Ricketts' complaint for failure to state a claim, which the district court granted. J.A. 87–88. The district court gave Ricketts 30 days to

14

file a motion for leave to amend her complaint and a proposed amended complaint.  J.A. 88.  Ricketts timely filed a motion for leave to amend, a proposed amended complaint, and several attached exhibits.  J.A. 103–224.

In Ricketts' proposed Second Amended Complaint, she appears to assert (1) a student-on-student harassment claim under Title VI of the Civil Rights Act, (2) a retaliation claim under Title VI of the Civil Rights Act, and (3) an equal protection claim against the Board of Education and several individual school faculty and administrators.  J.A. 103–59.[3]

Defendants opposed Ricketts' motion for leave to amend.  J.A. 9.  The district court denied Ricketts' motion for leave to amend, stating her "proposed amendment would be futile in whole[.]"  J.A. 248–49.

Ricketts timely appealed the district court's dismissal of her motion for leave to amend.

### III.

We review a district court's "denial of motion for leave to amend on the basis of futility" de novo*, Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019), *as amended* (Jan.

---

[3] The defendants school faculty and administrators are James Merrill, Cathy Moore, Marvin Connelly, Danny Barnes, Rodney Trice, Scott Lyons, Monica Sawyer, George Barilich, and Trudy Price-O'Neil.  Although the cover page of Ricketts' proposed amended complaint also lists several former and current Board members as individual defendants—Keith Sutton, Christine Kushner, James Martin, Roxie Cash, Monika Johnson-Hostler, Lindsay Mahaffey, Tom Benton, Bill Fletcher, Susan Evans, and Kevin Hill, J.A. 103—the complaint itself makes no allegations against those individuals, and Ricketts does not challenge on appeal the district court's dismissal of any claims against them.  *See* Appellant's Opening Brief at 17 n.17 (referencing J.A. 245).  Nor does Ricketts dispute the district court's holding that the Board of Education is the only proper defendant for her Title VI claims.  *See* J.A. 235–36.

9, 2019), and "accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiff[]," *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018).  Additionally, "[a] document filed pro se is 'to be liberally construed'" and "no matter how inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* FED. R. CIV. P. 8(e) ("Pleadings must be construed so as to do justice.").

## IV.

Before us on appeal is the district court's denial of Ricketts' motion for leave to amend.  In denying leave to amend on futility grounds, the district court held that the proposed amended complaint failed to state a claim for Title VI deliberate indifference, for Title VI retaliation, or for a violation of the Equal Protection Clause.  We address each claim in turn.

## A.

Title VI of the Civil Rights Act of 1964 provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Although this Court has not recognized the existence of a Title VI claim for student-on-student racial harassment, other circuits have done so.  *See Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1273 (11th Cir. 2023) (holding, in the context of Title VI, "a school district engages in intentional discrimination and is liable under Title VI when it is deliberately indifferent to known acts

16

of student-on-student racial harassment"); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (same); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014) (same); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012) (same); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.,* 334 F.3d 928, 934 (10th Cir. 2003) (same). We now join our sister circuits and recognize the existence of Title VI claims for student-on-student racial harassment.

In addition, Title VI claims "are parallel" to Title IX claims and "operate in the same manner." *Adams*, 80 F.4th at 1273. Accordingly, the standard articulated by the Supreme Court for Title IX claims in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) applies.

To successfully state a claim for deliberate indifference to student-on-student harassment, a plaintiff must show: (1) they were a student at an educational institution receiving federal funds; (2) they suffered racial harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021) (defining deliberate indifference standard in the context of sexual harassment); *see also Davis*, 526 U.S. at 646–52. A school acts with deliberate indifference when "its response to the alleged harassment or the lack of any such response

17

is clearly unreasonable in light of the known circumstances." *Fairfax Cnty. Sch. Bd.*, 1 F.4th 257 at 271 (internal brackets omitted).

Collectively, Ricketts' allegations are sufficient to state a Title VI claim for deliberate indifference at this stage against the Board of Education. As an initial matter, neither party disputes the first element is satisfied. *See* Appellant's Opening Br. at 28; Appellees' Br. at 26. Rather, the parties dispute whether the remaining elements are met.

First, Ricketts sufficiently alleged she suffered racial harassment that was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by Enloe. Ricketts alleged that during the first election campaign period, she and three other Black sophomore students were excluded from social media polls and posts created by student council members purporting to be representing Enloe. J.A. 115. Additionally, campaign materials, which included posters and bookbag-tags, belonging to Ricketts and three other Black sophomore students were defaced, ripped, and thrown throughout the Enloe building while white students' materials were left untouched. J.A. 115–16. On the day of the election, Ricketts, as well as the three other Black sophomore students, were excluded from the junior class ballot, which resulted in starting the election process over completely. J.A. 117–19, 128. Ricketts, the only Black student to re-declare her candidacy for the election, was met with "immediate[]" cyberbullying from "disgruntled candidates" and parents alike, labeled an "angry Black girl," blamed for "wrongly overreacting to a 'technical glitch'" of being left off the ballot, and was the only candidate whose campaign materials continued to be destroyed. J.A. 119–22. Beyond that, during this time, a student frustrated by the reelection made a bomb

18

threat at Enloe. J.A. 122. Additionally, the Enloe school newspaper was published, which referred to, amongst other things, a cockroach from a predominantly Black neighborhood who was running for student council and making bookbag-tags for its campaign. J.A. 168. Such incidents collectively—excluding Ricketts from polls and posts, destroying her campaign materials, labeling her an "angry Black girl," and mocking her campaign by way of a cockroach reference—rise above simple acts of teasing and name-calling among school children and sufficiently allege severe, pervasive, and objectively offensive harassment at this stage. *Davis*, 526 U.S. at 652 (stating, in the context of Title IX, "[d]amages are not available for simple acts of teasing and name-calling among school children[.]"); *see also Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022) (finding, in the context of a Title VII harassment claim, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario") (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015)). As a result of such severe and pervasive harassment, Ricketts was deprived of equal access to the educational opportunities or benefits provided by Enloe. Specifically, Ricketts was denied the benefit of an academic environment free from racial hostility. *See Zeno*, 702 F.3d at 665–66 (stating "[d]iscrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program" and "[e]ducational benefits include an academic environment free from racial hostility"). In addition, the severe and pervasive harassment led to Ricketts suffering from "incidents of fainting[,]" anxiety, emotional distress, suicidal thoughts, and a "sudden and drastic drop[] in grades in some classes." J.A. 153, 157–58. Hence, Ricketts sufficiently alleged she suffered racial harassment that

19

was so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by Enloe.

Second, Ricketts sufficiently alleged Enloe administrators had authority to address the alleged harassment and to institute corrective measures, and had actual notice or knowledge of the alleged harassment. Ricketts alleged the school district suspended at least one student in 2016, and three students in 2017 for sharing a private video with other students in which the three made "derogatory statements against different ethnic and racial groups[.]" J.A. 138–39, 147. As such, Ricketts has sufficiently alleged disciplinary authority at this stage. *See Zeno*, 702 F.3d at 665 (stating "a school district's authority to take remedial action lies in its longstanding disciplinary oversight over its students"); *see also Hurley*, 911 F.3d at 688 (finding appellant demonstrated university's "capacity to exercise control over students engaging in threatening online behavior" based on allegations in their complaint stating the university "had previously disciplined students . . . for derogatory off-campus speech). In addition, Enloe officials had actual notice or knowledge of the alleged harassment. Ricketts alleged, among other things, Enloe administrators: (1) were aware that she and other Black students were excluded from the junior class ballot; (2) were aware that her campaign materials had been destroyed; (3) received calls and emails from her mother requesting a meeting regarding ballot exclusion, but nonetheless refused to meet; (4) were contacted by a civil-rights advocate and a local NAACP leader who urged Enloe administrators to conduct an investigation on the ballot exclusion incident; (5) received numerous emails from Ricketts' mother asking Enloe administrators to "address expectations of equality[,]" as Black students were "being

20

blamed" and "targeted" for the reelection process; and (6) were aware that a local news outlet ran a story regarding the election and ballot exclusion. J.A. 116–19, 121, 125–126, 137, 173, 179. The fact Enloe administrators received calls, emails, and reports of alleged racial harassment from Ricketts, Ricketts' parent, and others is sufficient to establish Enloe administrators had "actual notice" of the alleged racial harassment. *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 266 (stating, in the context of sexual harassment, "if actual notice means being 'alerted' to the 'possibility' of sexual harassment occurring, a report alleging such harassment surely is sufficient to establish it"). As such, Ricketts has sufficiently alleged Enloe administrators had actual notice or knowledge of the alleged harassment at this stage. *See id.* at 267 (stating, "a school has actual notice or knowledge when it is informed or notified of the alleged harassment—most likely via a report"). Hence, Enloe administrators had authority to address the alleged harassment and to institute corrective measures, and had actual notice or knowledge of the alleged harassment.

Third, Ricketts sufficiently alleged Enloe administrators acted with deliberate indifference to the alleged harassment. Ricketts alleged Enloe administrators: (1) refused to meet about the ballot exclusion; (2) were aware her campaign materials were being destroyed but did nothing to stop it from happening; (3) made no attempt to address the harassment she endured before, during, and after the elections; and (4) merely advised Ricketts to "come see" an administrator to discuss the issue of harassment. J.A. 116–18, 133, 137, 185–86. While Enloe administrators were not entirely unresponsive and ultimately corrected the ballot exclusion by way of announcing a new election, they nonetheless failed to engage in efforts that were reasonably calculated to end the student-

21

on-student harassment that occurred before and after the elections. From the allegations in the proposed amended complaint, it can be inferred that the sum total of the Enloe administration's response to reports of racial harassment was to invite Ricketts—the victim—to "come see" them to discuss the issue. *Hurley*, 911 F.3d at 689 (finding "although [the university] was not entirely unresponsive to allegations of harassment—[the university] did not engage in efforts that were reasonably calculated to end the harassment" because the university "merely responded with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening") (internal quotation marks and brackets omitted); *see also Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 362 (5th Cir. 2022) (stating "[a] school district's meeting with a Title VI complainant to listen to reports of racial harassment, and its efforts to encourage complainants to make reports, are not remedial actions responsive to reported harassment under Title VI" and "a school district's offer" of listening and guidance "and nothing more may prove a clearly unreasonable response"). And when Ricketts' mother informed administrators that this was inadequate and that more affirmative outreach to her daughter was required, *see* J.A. 189, Enloe's administrators still took no further action. Hence, Enloe administrators acted with deliberate indifference to the alleged harassment.

The collective incidents alleged by Ricketts—from racial harassment, Enloe administrators having authority to address the harassment and being on notice of said harassment, and subsequently acting with deliberate indifference—are sufficient to state a Title VI claim for deliberate indifference at this stage. Accordingly, the district court erred

22

in holding that Ricketts' proposed amended complaint failed to state a Title VI deliberate indifference claim.

B.

To successfully state a claim for Title VI retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) the school took a material adverse action against her, and (3) a causal connection existed between the protected activity and the adverse action. *See Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003); *Hurley*, 911 F.3d at 694 (analyzing retaliation claim under Title IX). "As in other civil rights contexts, to show 'protected activity,'" a plaintiff asserting a Title VI retaliation claim need only prove she "opposed an unlawful . . . practice which [s]he reasonably believed had occurred or was occurring." *Peters*, 327 F.3d at 321.

Collectively, Ricketts' allegations are sufficient to state a claim for retaliation at this stage against the Board of Education. First, Ricketts has sufficiently alleged she was engaging in a protected activity, i.e., opposing ballot exclusion based on discrimination. Ricketts alleged she reported the ballot exclusion to Enloe administrators, stating the exclusion "look[ed] like discrimination." J.A. 118. This was based on Ricketts' reasonable belief that discrimination had occurred or was occurring, given the series of events that took place beforehand, including the destroying of her campaign materials and exclusion from social media polls and posts. *See* J.A. 115–16; *see also Peters*, 327 F.3d at 321. Thus, protected activity is sufficiently alleged at this stage.

Second, Ricketts has sufficiently alleged the school took a materially adverse action against her. Ricketts alleged that as a result of the restart of the election process, she was

23

subjected to cyberbullying and racial harassment by other students and their parents, labeled as one of the "angry Black girls" and blamed for "wrongly overreacting to a 'technical glitch' and calling it discrimination." As we have held, "student-on-student retaliatory harassment" can "rise to the level of material adversity" necessary to make out a retaliation claim. *Hurley*, 911 F.3d at 695–96. And schools "can be liable for acting with deliberate indifference to known instances of student-on-student retaliatory harassment" even though the school's "administrators did not personally participate in the harassment." *Id.* at 695, 696.

Ricketts also alleged retaliation in the form of direct action by school administrators: In a letter postmarked March 11, 2016—days after the start of the controversial new qualifying and campaign period—Lyons informed Ricketts' parents that because of excessive unexcused absences, Ricketts would be prohibited from participating in extra-curricular activities, including the new student council election. J.A. 151. While it appears that Ricketts' parents were able to prove that Ricketts' absences were in fact excused and thus head off the threatened election bar, that does not mean that the letter was not "materially adverse" for purposes of setting out a retaliation claim. To be actionable, retaliatory conduct need only be enough to "dissuade a reasonable person from making" a charge of discrimination. *See Hurley*, 911 F.3d at 694 (cleaned up). We think a reasonable school student in Ricketts' shoes—faced with a letter to her parents accusing her of a non-existent string of unexcused absences and threatening to exclude her from the election at the heart of the controversy—might well be dissuaded from lodging any further complaints, regardless of the ultimate outcome. *See Williams v. Mitchell*, ___ F.4th ___, 2024 WL

24

4886476 at *4 (4th Cir. 2024) (explaining that "attempted interference" with protected conduct may be materially adverse even if it "may have failed").

Third, Ricketts has sufficiently alleged a causal connection existed between the protected activity and the adverse actions. Ricketts alleged the adverse action of cyberbullying occurred "immediately" after she objected to ballot exclusion on the basis of discrimination and the election was re-scheduled. The letter to her parents likewise followed immediately on the heels of her original complaint. As to these allegations, temporal proximity is enough to make out a prima facie case of causation at this stage of the proceedings.[4] In sum, the allegations in Ricketts' proposed amended complaint are sufficient to state a Title VI claim for retaliation at this stage. Accordingly, as to this issue, as well, the district court erred in denying leave to file the amended complaint on futility grounds.

### C.

### 1.

The Fourteenth Amendment's Equal Protection Clause provides, in relevant part, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. 42 U.S.C. Section 1983 "provides a method for vindicating" one's Fourteenth Amendment rights. *See Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (stating 42 U.S.C. Section 1983 "is not itself a source of

---

[4] Ricketts also alleges materially adverse actions that occurred less proximately in time to her complaints: the failure of two teachers to follow through with letters of academic reference, the failure to reselect her for the varsity cheerleading team, and the denial of an International Baccalaureate diploma. J.A. 119, 152–53, 190. Because the allegations described above suffice to state a claim for retaliation, we need not rely on these additional allegations.

25

substantive rights, but rather provides a method for vindicating federal constitutional and statutory rights").

To successfully state an equal protection claim of this kind against an individual school administrator, a plaintiff must show:  (1) she was subject to discriminatory peer harassment; (2) the school administrator "responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances"; and (3) the school administrator's deliberate indifference was motivated by a discriminatory intent.  *Hurley*, 911 F.3d at 702–03 (analyzing an equal protection claim in the context of Title IX); *see also DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (analyzing an equal protection claim in the context of racial harassment).  That standard is very similar to the one we have applied already under Title VI, *see Hurley*, 911 F.3d at 703 (noting substantial similarity between equal protection and Title IX deliberate indifference standards), and we come to the same conclusion here.

Ricketts' allegations are sufficient to state an equal protection claim against individual defendants Lyons, Sawyer, Barilich, Merrill, Connelly, Barnes, and Trice, Enloe faculty or administrators involved in the events around the student council election.[5]  As previously discussed, Ricketts has sufficiently alleged the first two elements of an equal protection deliberate indifference claim:  discriminatory peer harassment and deliberate indifference at this stage.  Thus, the only element now at issue is the intent element, i.e.,

---

[5] By contrast, Ricketts' allegations against individual defendant Price-O'Neil—that she "condoned" the April edition of the Enloe school newspaper and "labeled the contents as just jokes," J.A. 113, 145—are so conclusory that they fail to state an equal protection claim, even at this early stage of the proceedings.

26

whether such deliberate indifference was motivated by a discriminatory intent. We think Ricketts has sufficiently alleged this element, as well.

With respect to Lyons, Ricketts alleged Lyons: (1) "ignore[d] . . . the repeated racial harassment against [Ricketts] both online and on campus and the multiple complaints" from her mother; (2) downplayed the ballot exclusion by stating it was a "mistake" or related to "some oversight" issues; (3) stated he had "not received any reports of harassment"; and (4) "participate[d]" in the April edition of the Enloe school newspaper that was riddled with racial stereotypes. J.A. 113–14, 119, 147, 173. With respect to Sawyer and Barilich, Ricketts alleged they were "aware of the discriminatory acts, but did nothing to address the situation" and refused to talk to Ricketts or the other Black candidates who were excluded. J.A. 116, 118, 137. With respect to Merrill, Connelly, and Barnes, Ricketts alleged they failed to meet to discuss the racial harassment, and/or failed to respond to her parent's numerous emails following up about said harassment. J.A. 118–19, 125, 179, 180–82. With respect to Trice, Ricketts alleged he "sympathized" with her mother's "frustration with Enloe administration's indifference to discrimination" but nonetheless stated he wore "two hats" and, subsequently, "stopped responding" to her mother's calls about harassment. J.A. 145. Ricketts has alleged these defendants, individually and collectively, have either blatantly ignored or "sought to downplay the harassment" she experienced and "made no effort to stop" it, which is sufficient to state the intent element of the equal protection claim. *See Hurley*, 911 F.3d at 703 (stating individual defendant "sought to downplay the harassment and threats, and . . . made no effort to stop them" and such "allegations are sufficient to state the intent element of the

27

equal protection claim"). Accordingly, the district court erred in finding Ricketts' proposed amended complaint failed to state an equal protection claim against individual defendants Lyons, Sawyer, Barilich, Merrill, Connelly, Barnes, and Trice.[6]

2.

To successfully state an equal protection claim against the defendant Board of Education, Ricketts must show her "harassment was the result of municipal custom, policy, or practice." *Hurley*, 911 F.3d at 700 (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257–58 (2009)). Such policies "may . . . be found in formal or informal ad hoc 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987)). In addition, "an official policy can be inferred from a municipality's omissions as well as from its acts" and "such omissions are actionable . . . if they constitute 'tacit authorization' of or 'deliberate indifference' to constitutional injuries." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983); *see also Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) (stating "[o]fficial policy may be established by the omissions of supervisory officials as well as from their affirmative acts").

---

[6] Because it held that Ricketts' proposed amended complaint failed to state a § 1983 claim against the individual defendants, the district court did not address those defendants' qualified immunity defense. J.A. 85 n.10. We leave resolution of this issue to the district court as the case goes forward. *See Riddick v. Barber*, 109 F.4th 639, 650 n.5 (4th Cir. 2024) (noting that "qualified immunity typically is best addressed at the summary judgment stage after the facts have been developed through discovery").

28

Collectively, Ricketts' allegations are sufficient to state an equal protection claim at this stage against the Board of Education. As an initial matter, and as discussed previously, Ricketts has sufficiently alleged the Board was deliberately indifferent. As such, "an official policy can be inferred[.]" *See Wellington*, 717 F.2d at 932. In addition, Ricketts alleged when "discussing the issue of indifference to discrimination and the ineffectiveness of resolution that [Ricketts] and other minority students faced[,]" some Board members stated "[t]hat's just the culture." J.A. 140. Moreover, the Board has been subject to "[p]ublic outcry" due to "discrimination against African American students" and "numerous discrimination complaints." J.A. 140. At this stage, such allegations are sufficient to allege an equal protection claim. Accordingly, the district court erred in dismissing Ricketts' equal protection claim against the Board of Education.

## V.

For the foregoing reasons, we reverse the judgment below, order the district court to allow Ricketts to amend her claim, and remand for further proceedings.

*REVERSED AND REMANDED*